UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:

THE GETCHELL AGENCY,

Debtor.

Chapter 11
Case No. 16-10172

(JOINTLY ADMINISTERED)

In re:

RENA J. GETCHELL,

Debtor.

Chapter 11
Case No. 16-10173

## MEMORANDUM OF DECISION ON SECOND APPLICATION OF POINT TO POINT SPECIALISTS, LLC FOR COMPENSATION

This matter came before the Court on the Second Application of Point to Point Business Specialists, LLC for Compensation (the "Second Fee Application") seeking allowance, on an interim basis, of compensation in the amount of $34,962.00 and reimbursement of expenses in the amount of $2,546.50 for a total interim fee and expense award in favor of Point to Point Business Specialists, LLC (the "Applicant") in the amount of $37,508.50.  During a hearing held on April 25, 2017, the Court expressed a number of concerns regarding the Second Fee Application and gave The Getchell Agency ("TGA") fourteen days to submit additional documentation addressing those concerns.  On May 3, 2017, the Applicant timely submitted a letter in support of the Second Fee Application (the "Applicant's Supplemental Statement").  On May 31, 2017, TGA filed an additional response entitled the Debtor's Supplemental Statement in Support of Entry of Proposed Order Granting Second Application of Point to Point Business Specialists for Compensation on an

Interim Basis ("TGA's Supplemental Statement").[1] Based upon the Court's review of the Application to Employ Point to Point Business Specialists, LLC as Consultants (the "Retention Application"), the Order Authorizing Employment of Professional Person entered on April 4, 2016 (the "Retention Order"), the Second Fee Application, the Applicant's Supplemental Statement and TGA's Supplemental Statement, the Applicant is hereby awarded, on an interim basis, $33,333.40 in fees and $2,546.50 in expenses for a total interim award of $35,879.90.

## I.    Jurisdiction and Venue.

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C §§ 157(a) and 1334 and the United States District Court for the District of Maine Local Rule 83.6(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B). Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    Background.

TGA filed its voluntary chapter 11 petition on March 25, 2016. On the same day, Rena J. Getchell, sole shareholder and President and Chief Executive Officer of TGA, also filed a voluntary chapter 11 petition. By order dated April 6, 2016, the chapter 11 cases of TGA and Ms. Getchell are jointly administered, though not substantively consolidated (the "Joint Administration Order").

On March 30, 2016, counsel for TGA filed the Retention Application on the docket in the TGA case seeking authority to retain the Applicant for the purpose of assisting "the Debtor and the Estate by providing management consulting, financial consulting, and accounting services and assistance to the Debtor." Docket Entry ("D.E.") 40. The term "Debtor" is not defined in the Retention Application but the application consistently uses that word in its singular form. The

---

[1] TGA's Supplemental Statement was not timely filed but the arguments presented therein are, to the extent relevant, addressed in this opinion.

prayer for relief states that the "Debtor respectfully requests that she be authorized to retain [the Applicant] on the foregoing terms and conditions . . ." Notwithstanding this single reference to the Debtor as "she," all other evidence points to TGA as the "Debtor" in the Retention Application.

First, the Retention Application was filed on the docket in TGA's bankruptcy case prior to entry of the Joint Administration Order and the case caption references only TGA's bankruptcy case. Likewise, the Retention Application was signed and filed by counsel for TGA; Ms. Getchell's separate counsel did not sign the document. Finally, the engagement letter attached as Exhibit C to the Retention Application (the "Engagement Letter") states that the Applicant "is prepared to come alongside The Getchell Agency, Inc." and further that the Engagement Letter constitutes a "best efforts agreement" between the Applicant and TGA. The Engagement Letter is addressed to Ms. Getchell at TGA. Ms. Getchell also signed the Engagement Letter but nowhere does she indicate whether she signed it individually, or in her capacity as an officer of TGA.

The Retention Application defined the scope of services to be provided to the "Debtor" by the Applicant as follows:

> Point to Point and the Debtor have agreed that Point to Point will assist the Debtor and the Estate by providing management consulting, financial consulting, and accounting services and assistance to the Debtor, including through:
>
> (1)      the review of financial information;
>
> (2)      the preparation of projections and any sale of assets in the Debtor's current business operations;
>
> (3)      the provision of on-going assistance to management with financial plans and strategies and service as a resource for financial analysis and information for the Debtor's bankruptcy case;
>
> (4)      additional services related to the administration of the Debtor's bankruptcy case and future operations, as described more fully in the Debtor's letter of engagement with Point to Point which is attached hereto as Exhibit C; and
>
> (5)      Point to Point shall coordinate with other professionals retained by the Debtor, including attorneys, accountants, and internal bookkeepers and staff.

*See* Retention Application at 1.  The Engagement Letter, which was apparently executed on the same day the Retention Application was filed, defines the scope of the Applicant's proposed engagement in slightly different terms.  In addition to services substantially similar to those mentioned above, the Engagement Letter describes the following, additional services:

> 4.    Point to Point Business Specialists will complete a thorough Operational Review including but not limited to the financial management, operating practices and staff performance of the enterprise.  This work will include related suggestions for performance improvements in each area.  We will present the Operational Review to you for review and discussion.  Based on our mutual appraisal of the suggestions, PtBS will be readily available to assist in the implementation of any or all of the suggested improvements to strengthen The Getchell Agency.

> 5.    PtBS will also assist in the preparation of Monthly Operating Reports and other financial documents that may be required in the bankruptcy proceeding, in collaboration with Debtor's counsel.

*See* Engagement Letter at 1.  On April 4, 2016, this Court entered a Retention Order authorizing TGA to retain the Applicant as consultants on the terms and conditions set forth in the Retention Application.

The Applicant filed a first application for compensation and reimbursement of expenses on September 21, 2016 (the "First Fee Application") pursuant to which the Applicant was awarded, on an interim basis, $67,857.94.  To date, TGA and Ms. Getchell have combined to engage eight different professionals and this Court has awarded $520,046.20 in fees and expenses on an interim basis.

At a November 2, 2016 hearing on several fee applications, including the First Fee Application, this Court expressed concern about potentially duplicative and overlapping services in light of the number of professionals engaged by TGA and Ms. Getchell and indicated that fee applications filed in this case should provide greater specificity and detail regarding the scope of the services provided and the benefit of those services to TGA's and Ms. Getchell's respective

bankruptcy estates.  With regard to the First Fee Application in particular, the Court raised specific concerns regarding lumping and, although the Court granted that application on an interim basis, the Applicant was specifically cautioned to keep more detailed time records going forward.

The Second Fee Application, filed on March 20, 2017, seeks compensation in the amount of $34,962.00 and reimbursement of expenses in the amount of $2,546.50 for a total interim award of $37,508.50.  At a hearing on April 25, 2017, the Court raised a number of concerns regarding the Second Fee Application including, but not limited to, concerns regarding scope, vagueness and duplication.  With respect to scope, the Court questioned time entries regarding services that were apparently performed for Ms. Getchell, individually, as opposed to TGA.  The Court further asked for additional information regarding communications between the Applicant and the office of the Governor for the State of Maine, which appeared to fall outside the scope of the Applicant's retention and also may be duplicative of services provided by attorneys handling issues with the Maine Department of Health and Human Services.  Finally, the Court highlighted a number of vague time entries. In order to allow the Applicant time to supplement the information provided to the Court, the matter was taken under advisement and a deadline was set for additional briefing.

In the Applicant's Supplemental Statement, the Applicant provides significantly more detail regarding work performed in connection with the use of debit cards by TGA and services performed in connection with the review of Ms. Getchell's mortgage account.  In addition, the Applicant provides some additional insight into its billing practices.  The Applicant represents that, on average, its professionals bill less than half of the services provided on a weekly basis and, typically, the Applicant does not include significant detail in its timekeeping entries.  Finally, the Applicant's Supplemental Statement includes quotes from Attorney Andrew Sarapas (counsel for

TGA) and Ms. Getchell commending the Applicant on that firm's professionalism, responsiveness and critical role in TGA's reorganization.

TGA's Supplemental Statement reiterates much of the information and many of the statements contained in the Applicant's Supplemental Statement. TGA reaffirms the Applicant's representations regarding that firm's practice of billing for only a portion of the services performed and further reiterates the critical nature and high quality of the services provided by the Applicant.

### III.    Applicable Statutes and Rules.

With court approval, a debtor-in-possession may employ one or more professionals in connection with the debtor-in-possession's chapter 11 case. *See* 11 U.S.C. §§ 327(a), 1107(a). Court approval may only be obtained upon application by the debtor-in-possession setting forth, *inter alia*, a particularized, case-specific summary of the services to be rendered by the professional and any proposed arrangement for compensation. *See* Fed. R. Bankr. P. 2014(a); D. Me. LBR 2014-3. Typically, professionals are employed on an hourly basis but a debtor-in-possession may employ a professional on any reasonable terms, including, but not limited to, on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. 11 U.S.C. § 328. However, the terms of the employment must be set out in the retention application. Fed. R. Bankr. P. 2014(a).

A professional seeking compensation must file an application pursuant to Fed. R. Bankr. P. 2016 and D. Me. LBR 2016-1. Each fee application must be accompanied by, *inter alia*, time and task records which set forth a description of each task performed in tenth of an hour increments. D. Me. LBR 2016-1(a)(3)(i). A professional may ask to be excepted from the requirements concerning submission of detailed statements, timekeeping, billing or other

summaries but any such request must be made in the retention application.  D. Me. LBR 2016-1(a)(2).

The time and task record requirement is designed to ensure that the Court is provided with all of the information necessary to determine whether compensation sought by the professional is reasonable and that the services rendered were actual and necessary.  11 U.S.C. § 330(a)(1).

> In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).  The Court is explicitly prohibited from allowing compensation for unnecessary duplication of services or service which were not reasonably likely to benefit the debtor's estate or necessary to the administration of the case.  11 U.S.C. § 330(a)(4)(A).  In other words, the Court is mandated with the task of conducting an independent review of fees and expenses to ensure that they are reasonable, actual and necessary.

## IV.    Analysis

The Second Fee Application consists of just eleven paragraphs; only one of which addresses the nature of the services performed by the Applicant during the applicable compensation period.  That paragraph is comprised wholly of billing detail cut and pasted from the attached invoices.  No context is provided with respect to those time entries and no explanation is provided as to how those services benefitted the estate.  Further, although this Court raised concerns early and often regarding the potential for duplicative services among the various professionals retained by TGA and Ms. Getchell, the Second Fee Application fails to provide any explanation as to how the services provided by the Applicant are unique to those provided by other professionals.

The lack of information contained within the body of the Second Fee Application might be easier to overlook if the billing detail provided more information regarding the services provided. The invoices attached as Exhibit B, however, do not provide the Court with sufficient information to determine whether many of the fees billed during this period were reasonable, actual and necessary.  Specifically, the Court identified numerous time entries which are vague or lumped, or raise questions regarding duplication and scope.

**Vagueness.**  In order to comply with its statutory mandate to determine whether fees are reasonable, actual and necessary, the Court must have sufficient information to determine the nature of the services provided and the relevance of those services to the administration of the bankruptcy estate.  This information is supplied through time entries which identify each particular service performed and through a narrative within the application supplying context to those entries. The following time entries are so vague as to leave the Court wondering what service was performed, or how that service relates to the administration of TGA's case.

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 9/12/2016 | Sr. Financial Analyst<br>Infraction Classifications | 1.0 | 65.00 | 65.00 |
| 9/16/2016 | Principal<br>Administrative work on case | 1.1 | 190.00 | 209.00 |
| 9/26/2016 | Principal<br>Work with A Sarapas on Plan Documentation | 1 | 190.00 | 190.00 |
| 9/27/2016 | Principal<br>Work with A Sarapas on Plan Documentation | 1 | 190.00 | 190.00 |
| 9/28/2016 | Principal<br>Work with A Sarapas on Plan Documentation | 2.2 | 190.00 | 418.00 |
| 9/29/2016 | Principal<br>Work with A Sarapas on Plan Documentation | 0.4 | 190.00 | 76.00 |
| 9/30/2016 | Principal<br>Work with A Sarapas on Plan Documentation | 1.25 | 190.00 | 237.50 |
| 10/21/2016 | Principal<br>Call with Rena | 0.4 | 190.00 | 76.00 |
| 10/24/2016 | Principal<br>Present at Court Hearing re:ST, **followed with meeting with R Getchell & A Sarapas**[2] | 3.7 | 190.00 | 703.00 |
| 10/25/2016 | Principal<br>Meeting with R Getchell to review open items | 1.1 | 190.00 | 209.00 |
| 11/1/2016 | Principal<br>Review of A Sarapas pleading, Call with Jamie and e-mail with Jeff | 0.7 | 190.00 | 133.00 |
| 11/29/2016 | Principal<br>**Calls with Rena** and follow up to e-mail re:DHHS | 0.7 | 190.00 | 133.00 |
| 12/27/2016 | Principal<br>Meetings with Rena, Jillyan & Jeff (associated travel for 4 hours at $55.00/hr totaling $220.00) | 4.1 | 190.00 | 779.00 |
| 1/20/2017 | Principal<br>Meeting with R Getchell, A Sarapas & B Loring (associated | 3.15 | 190.00 | 598.50 |

---

[2] The vague portion of the entry is in **bold**.  That portion of the entry appearing in normal font is not vague.

| | travel for 2 hours at $55.00/hr totaling $110.00) | | | |
|---|---|---|---|---|
| 2/1/2017 | Sr. Financial Analyst MLO Analysis of Billing | 0.5 | 65.00 | 32.50 |

Some of these entries, like the September 12, 2016 time entry regarding "Infraction Classifications" would be sufficiently detailed if the body of the Second Fee Application included a narrative generally explaining the nature of the services provided during the applicable compensation period. Others, such as the September 26, 2016 time entry regarding "Work with A Sarapas on Plan Documentation" require more detail (either in a narrative within the body of the application or in the time entry itself) to allow the Court the opportunity to determine how the services provided by the Applicant are distinct from those provided by TGA's bankruptcy counsel and other professionals. Although the Court assumes that the Applicant mainly provided financial information necessary to formulate plan projections, the time entry does not specifically identify the Plan Document with respect to which the Applicant provided assistance. Moreover, that exact entry is used to describe services provided on multiple days. Without more information, it is impossible for the Court to determine whether the amount of time billed to that activity is reasonable.

Finally, time entries such as those recorded on October 21, 2016, October 24, 2016 and October 25, 2016 referencing calls or meetings with Ms. Getchell should provide some insight as to the range of topics discussed. In an attempt to provide clarification to these time entries, the Applicant states in the Applicant's Supplemental Statement, "All I can say here is that they are mainly listening and a few supporting words and directions but can last over an hour and are all times of the day, night, and throughout the course of the weekend." The Applicant goes on to state that the diverse topics covered during a call make it difficult to accurately capture time and that a

large portion of the calls go unbilled.  The Court is sympathetic to the problem presented by the Applicant.  However, to the extent that a call does not benefit TGA's estate, or relates to issues outside the scope of the Applicant's engagement, that portion of the time spent on the call is noncompensatory.  On the other hand, if a call involves issues within the scope of the Applicant's engagement, the Applicant may appropriately bill for the conversation, but must ensure that the associated task description accurately describes in general terms the topic of each conversation. This information is particularly significant where, as discussed below, the Court has concerns regarding the scope of the services for which the Application seeks compensation and the Applicant has admitted to providing services to Ms. Getchell even though the Applicant has not been retained as Ms. Getchell's consultant. A general list of topics would provide sufficient information for the Court to conduct its review under 11 U.S.C. § 330, without divulging client confidences.

In the Applicant's Supplemental Statement, the Applicant explains that the billing requirements imposed by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules for the District of Maine are inconsistent with that firm's historical billing practices.  That may be so, but in a bankruptcy case, where a professional's compensation constitutes an allowed administrative claim paid ahead of unsecured creditors, that professional should expect scrutiny of his or her fees and expenses by the Court and the Office of the United States Trustee.

Notwithstanding the foregoing, the Bankruptcy Code is not completely inflexible. Congress recognized that professionals may be compensated in a variety of ways.  11 U.S.C. § 328.  Likewise, D. Me. LBR 2016-1(a)(2) permits professionals who do not typically bill in one-tenth hour increments to request an exception from the billing and task record requirements set

forth in that rule.  While the Court is not suggesting that such an exception is appropriate here, the

Applicant should, in the future, carefully consider the terms of its retention at the time the retention

application is filed, and then be cognizant of the Court's mandate under 11 U.S.C. § 330 when

preparing documentation necessary to support its claim for compensation.

In all, the Court identified time entries totaling 22.3 hours and $4,703.50 in fees (with

additional associated travel time of $330.00) containing insufficient information to allow the Court

an opportunity to determine whether the fees were reasonable, actual and necessary.

**Lumping.**   Lumping, the practice of billing multiple tasks within a single entry,

complicates the Court's task of determining whether fees are reasonable.  While professionals are

not expected to individually bill every minor task, large tasks should be separately billed.  The

following entries are examples of impermissible lumping.

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 9/15/2016 | Principal<br>Work on 5 Year Plan, review and advise on AP, calls with Rena, a Sarapas and J Joaquin | 3.8 | 190.00 | 722.00 |
| 10/24/2016 | Principal<br>Present at Court Hearing re:ST, followed with meeting with R Getchell and A Sarapas | 3.7 | 190.00 | 703.00 |
| 11/2/2016 | Principal<br>Call with Rena on status of operations and Sleep Time, Call with Susan response to DHHS questions, Oct MOR | 2.5 | 190.00 | 475.00 |

In total, the Court identified time entries totaling 10 hours of lumping and $1,900.00 in

fees in which the Applicant impermissibly lumped large tasks.

**Duplication.**   The Court previously warned the professionals in this case that fees would

be closely scrutinized for duplicative billing. Again, the Court stresses that, to the extent

12

professionals seek compensation in this case with respect to a matter being addressed by one or more other professionals, the fee detail or the body of the application should explain how the services provided by the applicant uniquely benefitted the estate.  While the Court appreciates that a financial consultant, much like bankruptcy counsel, must necessarily touch many different aspects of a bankruptcy case, there is a potential for duplication; particularly with respect to matters on which special counsel or specialized professionals have been retained.  In the billing detail attached to the Second Fee Application, the Court identified three potential areas for duplicative billing: (1) the "sleep time" claims; (2) taxes; and (3) issues raised by the Maine Department of Health and Human Services ("DHHS").

Although the Applicant did not specifically distinguish its services with respect to the "sleep time" claims, the Court can imagine how those claims might require the unique skills and expertise of a financial consultant.  For one, the claims were premised upon recordkeeping and payroll issues that would fall squarely within the scope of the Applicant's retention.  Second, the terms of the settlement negotiated in connection with those claims significantly impacted TGA's cash flow, as well as its chapter 11 plan projections.  These issues would likewise reasonably require the assistance of a financial consultant.    The Applicant is advised, however, that for the reasons set forth above, future fee applications should provide sufficient information to allow the Court to determine the unique nature of the Applicant's role on matters involving more than one professional.

The risk of duplicative services is greater with respect to taxes, however.  With the Court's approval, TGA retained Purdy Powers & Co. for the purpose of providing financial and tax consulting services to TGA and Ms. Getchell, including services related to amending prior year tax returns and completing and filing tax returns for 2015, as well as "such additional tax and

financial consulting services as may be required." Notwithstanding the involvement of this tax

professional, the Second Fee Application contains the following time entries:

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 9/12/2016 | Principal<br>Meeting in Portland with Rena & Wayne at Powers office for review & signatures of 2012 (with associated travel for 2 hours at $55.00/hr totaling $110.00) | 1.25 | 190.00 | 237.50 |
| 1/30/2017 | Principal<br>Work with Purdy Powers on obtaining signatures for amended 2013 & 2014 returns | 0.4 | 190.00 | 76.00 |
| 1/31/2017 | Principal<br>Work with Purdy Powers on obtaining signatures for amended 2013 & 2014 returns | 0.2 | 190.00 | 38.00 |

In response to the concerns raised by the Court at the April 25, 2017 hearing, the Applicant

provided the following explanation regarding tax services:

> With PtPBS leadership, TGA has been able to submit amended tax returns for 2012, 2013 & 2014, basically reviewing all of the "needs receipts" and credit card charges line by line for each of those years, obtaining over $440,000 in tax benefit for Rena/TGA. We are still in the process of addressing 2015 and anticipate a similar level of benefit for that year.

This explanation is exactly the type of information that facilitates a determination of reasonable

and necessary fees. In this instance, however, the explanation does not seem to match the billing

detail except, perhaps, with respect to the first part of the September 12, 2016 time entry. It is not

clear to the Court why *any* professionals, let alone *two*, need to bill time in connection with the

apparently ministerial task of obtaining signatures on tax returns; signatures which a debtor-in-

possession has a fiduciary duty to sign. Moreover, to the extent that the Applicant performed

services for the benefit of Ms. Getchell, rather than TGA, those services fall outside the scope of

the Applicant's engagement and, therefore, are not compensable.

14

Finally, TGA and Ms. Getchell retained two firms as special counsel for the purpose of addressing certain issues raised by DHHS: Rudman Winchell and Perkins Olson.  In addition, by virtue of an order authorizing TGA to retain Strout & Payson as successor counsel (despite continued, simultaneous representation by Molleur Law Office) TGA currently employs two firms as bankruptcy counsel.  Each time the Court questions why TGA requires the assistance of four law firms, the justification is premised, at least in part, on each firm's familiarity with the DHHS issues.

In light of the number of professionals retained to deal specifically with the DHHS issues and the nature of those issues, the Court would expect the Applicant's role with respect to the DHHS matter to be limited to reconciling and supplying relevant billing records.  The following time entries, however, seem to indicate that the Applicant may be providing services duplicative of those provided by other professionals or more consistent with services those others professionals have been engaged to provide.

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 9/19/2016 | Principal<br>DHHS work and call with Katie Foster, meeting with TGA regarding DHHS | 3.25 | 190.00 | 617.50 |
| 9/20/2016 | Principal<br>On site with A. Sarapas, work on DHHS response (with associated travel for 4 hours at $55.00/hr totaling $220.00) | 2.2 | 190.00 | 418.00 |
| 9/29/2016 | Principal<br>**On site to review DHHS work** and meeting with J Joaquin re: financial work | 3.25 | 190.00 | 617.50 |
| 10/3/2016 | Snr. Partner<br>Calls with Rena, Joaquin, draft letter to DHHS addressing violations | 4.25 | 170.00 | 722.50 |
| 10/4/2016 | Principal | 2.8 | 190.00 | 532.00 |

| | | | | |
|---|---|---|---|---|
| | **Calls with Rena regarding DHHS MAAT report request, DHHS document transmission**, A Sarapas on progress on the PLAN | | | |
| 10/18/2016 | Principal<br>Meet with S Gregorie of DHHS and deliver additional records | 0.5 | 190.00 | 95.00 |
| 10/25/2016 | Principal<br>Review & revise A Sarapas correspondence with DHHS | 0.4 | 190.00 | 76.00 |
| 11/2/2016 | Principal<br>Call with Rena on status of operations and Sleet Time, **Call Susan response to DHHS questions,** Oct MOR | 2.5 | 190.00 | 475.00 |
| 11/7/2016 | Principal<br>Work with Jeff on DHHS Supplement Service document | 0.8 | 190.00 | 152.00 |
| 11/8/2016 | Principal<br>Meeting with J Joaquin to review October Performance, update budget and **DHHS filings** | 0.75 | 190.00 | 142.50 |
| 11/29/2016 | Principal<br>Calls with Rena and follow up to e-mail re:DHHS | 0.7 | 190.00 | 133.00 |
| 1/7/2017 | Principal<br>Review DHHS correspondence and work on correspondence to Governor | 1.8 | 190.00 | 532.00 |
| 1/19/2017 | Principal<br>**Pursue meeting with Governor LePage**, calls with Rena & emails with A Sarapas re:ST payments | 0.75 | 190.00 | 142.50 |
| 1/30/2017 | Sr. Financial Analyst<br>Review & Edit to LePage | 1.25 | 65.00 | 81.25 |

The Court has frequently and explicitly expressed concerns regarding the duplication of efforts on the DHHS matter, in particular. It is puzzling, therefore, that the Second Fee Application does not provide detail sufficient to determine the Applicant's role with respect to the DHHS issues. The Applicant is urged, in the future, to provide both more detailed billing records and a

16

narrative which would shed light on the exact nature of the services provided in connection with this matter.

In total, the Court identified time entries totaling 27.05 hours and $5,088.25 in fees which appear to overlap with the types of services for which Purdy Powers & Co., Rudman Winchell, Perkins Olson or Strout & Payson were retained to provide.

**Scope.**  Since retention applications are often filed in the busy first days of a new chapter 11 case, the temptation is to rush through these somewhat routine applications in order to focus on seemingly more pressing matters such as cash collateral, utilities, critical vendors and post-petition financing.  Although routine, retention applications are critical documents establishing the scope of employment, the method and manner of seeking compensation and the form of compensation.

The Court finds, and the Applicant apparently does not dispute, that the Applicant was retained solely by TGA to provide only those services listed within the Retention Application and the Engagement Letter.  The billing detail attached to the Second Fee Application raises a couple of areas of concern, however.  Specifically, the Applicant is apparently seeking compensation for services performed for Ms. Getchell, individually, and for certain DHHS-related tasks which seem more political and financial.

**Ms. Getchell.**  A number of time entries reference work performed with respect to a mortgage relating to properly owned by Ms. Getchell, individually.

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 10/7/2016 | Sr. Financial Analyst Home Mortgage Analysis | 0.75 | 65.00 | 48.75 |
| 10/17/2016 | Review and work on R Getchell home mortgage, addressing high interest rates and suggest refinancing | 1.4 | 190.00 | 266.00 |
| 10/28/2016 | Meeting with Allstate agent on Rena's Life Insurance | 4 | 55.00 | 220.00 |

17

These tasks clearly fall outside the scope of the Applicant's retention and these fees totaling $534.75 will be disallowed in their entirety.

**Political activities.**  A number of time entries relate the drafting of, and revisions to, communications with the Governor's office, or engaging the Governor in a dialogue regarding TGA.  While communications with the Governor's office may be informed by financial and organizational information prepared by the Applicant, the Court does not understand why a professional retained mainly for the purpose of providing financial and organizational consulting services would be spearheading negotiations with the Governor's office.  This is particularly true where both Rudman Winchell and Perkins Olson have been retained specifically to deal with the DHHS issues.  The following time entries appear to fall outside the scope of the Applicant's retention:

| Date | Service | Hours | Rate | Amount |
|------|---------|-------|------|--------|
| 10/25/2016 | Principal<br>Draft and Overview & Positional statement for Governor LePage | 4.7 | 190.00 | 893.00 |
| 10/26/2016 | Principal<br>Call with Rena regarding Puzzle Pieces to Gov LePage | 0.5 | 190.00 | 95.00 |
| 11/7/2016 | Sr. Financial Analyst<br>Letter – Sleep Time to Governor. | 2.5 | 65.00 | 162.50 |
| 1/7/2017 | Principal<br>Review DHHS correspondence and work on correspondence to Governor | 1.8 | 190.00 | 342.00 |
| 1/19/2017 | Principal<br>**Pursue meeting with Governor LePage**, calls with Rena & e-mails with A Sarapas re:ST payments | 0.75 | 190.00 | 142.50 |
| 2/23/2017 | Sr. Financial Analyst<br>Review & Edit letter to LePage | 1.25 | 65.00 | 81.25 |

It is possible that the letters and communications with Governor LePage's office relied heavily upon financial data or business records with which the Applicant is the most familiar. Absent such additional information, however, these services seem to fall outside the scope of the Applicant's retention.

The Applicant represents that it has billed for only a portion of the services provided to TGA.  TGA has represented to the Court, through its bankruptcy counsel and Ms. Getchell, that the Applicant has provided extensive, quality services to TGA which have been critical to any successes achieved by TGA in this chapter 11 case.  While the Court generally believes the representations to be true, they are not sufficient to meet the requirements established in 11 U.S.C § 330, Fed. R. Bankr. P. 2016 and D. Me. LBR 2016-1.

A fee award constitutes an administrative expense claim under 11 U.S.C. § 330(a) which enjoys priority over the claims of other creditors.  11 U.S.C. §§ 503(b)(2), 507(a)(2).  This claim must be supported by sufficient documentation to allow the Court to conduct the independent review required by 11 U.S.C. § 330(a).  In a typical chapter case 13 where the issues are more limited, the creditor body is less likely to be active, fewer professionals are involved and the fees are substantially smaller, fee applications are understandably less detailed.  With the increased fees and complexity presented by chapter 11, however, retention and fee applications must be clear, detailed and prepared with care.  Failure to appropriately consider the terms of retention and the nature of the services provided in connection with that retention may result in a disallowance of fees.

This is an interim fee application pursuant to 11 U.S.C. § 331.  Any fees granted on an interim basis are subject to future disgorgement unless and until they are allowed on a final basis at the conclusion of the retention.  Taken as whole, the Court is not offended by the number of fees

billed by the Applicant through the second compensation period.  Overall, the fees appear reasonable even if the supporting document lacks sufficient detail to enable the Court to engage in the kind of review 11 U.S.C. § 330(a) requires.  As a result, the Court is willing to allow the large majority of the fees sought in the Second Fee Application on an interim basis, with the following warnings to the Applicant and the other professionals in this case: (1) the Court will be reviewing the fees billed in this case *in toto* upon submission of final fee applications and, to the extent that duplication is apparent or the fees are otherwise unreasonable, compensation awarded on an interim basis may be subsequently disallowed; and (2) future fee applications lacking the required specificity may result in orders disallowing a larger number of fees.

With respect to this Second Fee Application, the following fees will be disallowed:

- $534.75 billed in connection with services provided for Ms. Getchell's individual benefit;

- $470.35, representing ten percent of the fees billed in connection with time entries identified as vague; and

- $623.50, representing one half of the fees billed in connection with time entries identified as impermissibly lumped (but excluding the October 24, 2016 time entry which was also identified as vague).

The Court will, for purposes of this Second Fee Application, assume that if the Applicant had provided the necessary context, the time entries identified as potentially falling outside the scope of the Applicant's retention or duplicative of services provided by other professionals would not have drawn the Court's scrutiny.

## V.     Conclusion.

For the foregoing reasons, the Applicant is hereby allowed, on an interim basis, fees in the amount of $33,333.40 and reimbursement of expenses in the amount of $2,546.50 for a total interim award of $35,879.90.   Fees in the amount of $1,628.60 are hereby disallowed.   The Applicant is entitled to interim compensation pursuant to the terms of the Retention Application, as approved by the Retention Order.   Since fees under the interim compensation procedures are subject to a fifteen percent (15%) holdback and just five percent (5%) of the total fees sought here have been disallowed, the Court does not expect that the Applicant will need to refund any fees to TGA.


Dated:  June 22, 2017                                              /s/ Peter G. Cary
                                                                         Judge Peter G. Cary
                                                                         United States Bankruptcy Court